IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILLIE J. BURKE, JR.,
      Petitioner,

vs.                        Case No.:  4:17cv254/RH/EMT

MARK S. INCH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 40).  Petitioner filed a reply (ECF No. 46).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that the pleadings and attachments before the

court show that Petitioner is not entitled to relief.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established

by the state court record (*see* ECF No. 40).[1]   Petitioner was charged in the Circuit

Court in and for Leon County, Florida, Case No. 2009-CF-2774, with three counts

of attempted armed robbery with a firearm (Counts I, V, and VII), eleven counts of

armed robbery with a firearm (Counts II–IV, VI, VIII–XII, XXV, and XXVII), and

fourteen counts of armed kidnapping (Counts XIII–XXIV, XXVI, and XXVIII) (Ex.

B1 at 18–22).   Prior to trial, the State nolle prossed two armed robbery counts and

two armed kidnapping counts (XII, XXIV, XXV, and XXVI) (Ex. B4 at 227–28).

Following a jury trial on October 25–26, 2011, and deliberations which lasted only

twenty (20) minutes (Exs. B3, B4), Petitioner was found guilty as charged of the

remaining counts (Ex. B1 at 99–108).   At the conclusion of trial, the court sentenced

Petitioner to terms of fifteen (15) years in prison on the attempted armed robbery

counts, and life sentences on the remaining counts, with pre-sentence jail credit of

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 40).   If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

798 days, and with all sentences running concurrently but consecutive to the federal sentence Petitioner was serving at the time of sentencing (*id.* at 112–22).  Petitioner filed a motion to correct sentencing error, pursuant to Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure, requesting that the court strike a monetary fine ($2,100), two statutory surcharges ($105 and $20), costs of prosecution ($100), and the Indigent Legal Assistance Fee ($100) from the judgment (Ex. B5 at 144–57).  Petitioner also requested that the court correct the sentencing scoresheet to reflect a primary offense date of July 18, 2009 (*id.*).  The trial court granted the motion with respect to the fine and the $105 surcharge, but denied the motion in all other respects (*id.* at 171).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D11-6054 (Ex. B7).  Petitioner's counsel filed a brief, pursuant to *Anders v. California*, 386 U.S. 738 (1967), asserting that there were no meritorious arguments to support the contention that reversible error occurred in the trial court, but that the court erred by failing to correct the error on the scoresheet and failing to strike the $20 statutory surcharge and the $100 costs of prosecution (*id.*).  The First DCA provided Petitioner an opportunity to file a pro se initial brief, but he did not do so (*see* Exs. B8, B9).  On November 26, 2012, the First DCA affirmed Petitioner's convictions and sentences without comment, but

reversed and remanded the judgment for the trial court to strike the $20 statutory surcharge and correct the scrivener's error on the scoresheet to reflect a primary offense date of July 18, 2009 (Ex. B10). *Burke v. State*, 101 So. 3d 406 (Fla. 1st DCA 2012) (Table). The mandate issued December 26, 2012 (Ex. B11).

On February 12, 2013, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, presenting fourteen (14) claims (Ex. C2 at 197–225). The state circuit court ordered an evidentiary hearing on all claims, and appointed counsel to represent Petitioner (*id.* at 257, 264). The evidentiary was held on November 7, 2014 (Ex. C3 at 292–450). The circuit court denied the Rule 3.850 motion on December 11, 2014 (Ex. C2 at 272–76). Petitioner appealed the decision to the First DCA, Case No. 1D14-5777 (Ex. C6). The First DCA affirmed the circuit court's decision per curiam without written opinion on December 16, 2015 (Ex. C8). *Burke v. State*, 181 So. 3d 486 (Fla. 1st DCA 2015) (Table). The mandate issued January 12, 2016 (Ex. C9).

On March 15, 2016, Petitioner filed a motion to correct illegal sentence in the state circuit court, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. D1 at 3–4). The circuit court denied the motion on December 21, 2016 (*id.* at 8–9). Petitioner appealed the decision to the First DCA, Case No. 1D17-

0223 (Ex. D2).  The First DCA affirmed the circuit court's decision per curiam without written opinion on May 26, 2017 (Ex. D4).  *Burke v. State*, 226 So. 3d 814 (Fla. 1st DCA 2017) (Table).  The mandate issued October 9, 2017 (Ex. D7).

Petitioner filed the instant federal habeas action on May 30, 2017 (ECF No. 1).

## II.   STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254.  Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)**   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The federal court defers to the

state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable

application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the

Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this standard is difficult to meet, that is because it was meant to be."  *Richter*, 562 U.S. at 102.

## III.   EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner exhaust available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  The Court held that, for purposes of exhausting state remedies, a claim must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  *Picard*, 404 U.S. at 277.

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review.  *See Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  In such an instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  *Id.* at 1303.

To overcome a procedural default, the petitioner must show cause for the default and prejudice resulting therefrom, or that the federal court's failure to reach the merits of the claim would result in a fundamental miscarriage of justice. *Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Id.* Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* The actual-innocence exception is a narrow exception that requires factual innocence, not mere legal insufficiency. *McKay v. United States*, 657 F.3d 1190, 1197–98 (11th Cir. 2011).

Within this framework, the court will review Petitioner's claims.

## IV.   PETITIONER'S CLAIMS[2]

A.   Ground Two:  "Trial counsel was ineffective for failing to present a misidentification defense, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."

Petitioner alleges two of the victims, Jimmie Freeman and Farren Longenecker, told law enforcement that the "third" robber (alleged to be Petitioner) had a large tattoo on his neck (ECF No. 1 at 9–12).  Petitioner alleges his first defense attorney hired a private investigator, who interviewed another victim, Lisa Marin, as well as an eyewitness, Claude Williams, and they both described the "third" robber as having a large tattoo on the side of his neck (*id.*).  Petitioner alleges his trial attorneys, David and Charles Collins, knew about the descriptions of the tattoo, and counsel knew that Petitioner did not have a tattoo on his neck (*id.*).  Petitioner alleges defense counsel was ineffective for failing to pursue a misidentification defense by

---

[2] For organizational purposes, the court addresses Petitioner's claims in a different order than he presented them in his § 2254 petition.

displaying Petitioner's neck to the jury and arguing that he did not match the description of the "third" robber because he did not have a tattoo (*id.*). Petitioner alleges the evidence against him was "hardly compelling," and included his fingerprint at the scene, a ski mask recovered from his home, an "ambiguous statement about his ring," and testimony from a "career snitch" (*id.* at 12–13).

Petitioner states he presented this claim as Ground Four of his Rule 3.850 motion (ECF No. 1 at 16; ECF No. 46 at 13, 16–17). He alleges one of his defense attorneys, Charles Collins, testified at the post-conviction evidentiary hearing that one of the reasons he did not display Petitioner's neck to the jury was because he did not know whether doing so was testimonial in nature (ECF No. 1 at 10–12, 14–15). Petitioner contends it was clearly established under Florida law that such a display was not testimonial (*id.*). Petitioner contends the state court's adjudication of this ineffective assistance of trial counsel ("IATC") claim was based upon an unreasonable determination of the facts, and was contrary to and an unreasonable application of *Strickland v Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (*id.* at 13–16). Petitioner argues that if this court determines that the IATC claim is unexhausted, he is entitled to federal review of the claim under *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) (ECF No. 1 at 17–18; ECF No. 46 at 14–20). Petitioner also contends he is entitled to review

under the "fundamental miscarriage of justice" exception, because he is "actually innocent" (ECF No. 1 at 18).

Respondent contends Petitioner presented a "substantially abbreviated" version of this IATC claim in his Rule 3.850 motion (ECF No. 40 at 11–12). Respondent contends Petitioner did <u>not</u> fairly present the argument that counsel's ignorance of the law regarding the non-testimonial nature of displaying the tattoo was incompetent (*id.* at 12–13). Respondent contends although Petitioner presented this argument in his post-conviction appeal, the First DCA could not consider it, because Petitioner did not present it to the lower court (*id.* at 13). Respondent contends this aspect of Ground Two is thus unexhausted and procedurally barred (*id.* at 13–14). Respondent contends the remainder of Petitioner's arguments in Ground Two were adjudicated on the merits (*id.* at 50). Respondent contends the state court's adjudication of those arguments was not objectively unreasonable (*id.* at 50–52).

The state court record demonstrates that Petitioner argued in Ground 4 of his Rule 3.850 motion that defense counsel was ineffective for failing to present a "mistaken identity" defense by displaying Petitioner's "naked neck" at trial (Ex. C2 at 204–07). Petitioner argued that if counsel had done so, it would have demonstrated to the jury that he did not have a tattoo on his neck and, therefore, did

not match the description of the "third" robber provided by three witnesses, Farren Longenecker, Claude Williams, and Lisa Marin (*id.*). Petitioner argued in his supporting memorandum that displaying his tattoo was "non-testimonial evidence" which would have supported a misidentification defense (*id.* at 235–36). Petitioner also presented these arguments in his post-conviction appeal (*see* Ex. C6 at 21–27). The undersigned concludes Petitioner fairly presented the entirety of Ground Two to the state courts in his post-conviction pleadings. Petitioner's having satisfied the exhaustion requirement, the court will determine whether Petitioner has satisfied § 2254(d).

1.    Clearly Established Federal Law

Petitioner correctly identifies *Strickland v. Washington*, 466 U.S. 668 (1984) as setting forth the standard for evaluating claims of ineffective assistance of counsel. To obtain relief under *Strickland*, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under

prevailing professional norms." *Strickland*, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no

relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As to the prejudice prong of the *Strickland* standard, Petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder

would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies [sic] of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), *Strickland* prejudice is gauged against the outcome of trial, not on appeal. *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland*

with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### 2. Federal Review of State Court Decision

Petitioner argued in Ground Four of his Rule 3.850 motion that defense counsel presented a "totally empty defense of 'my client did not do it.'" (Ex. C2 at 206). Petitioner alleged counsel did not present any evidence to support this defense, and instead simply cross-examined the State's witnesses regarding the conduct of the other two robbers, one of whom carried a gun (*id.*). Petitioner argued that counsel could have pursued and presented a misidentification defense (*id.*). He alleged three eyewitnesses, Farren Longenecker, Claude Williams, and Lisa Marin, told investigators that the "third" robber had a tattoo on his neck (*id.* at 204–05, 206). Petitioner alleged Ms. Longenecker and Mr. Williams did not testify at trial, but they provided pre-trial statements describing the neck tattoo (*id.* at 205). Petitioner alleged Ms. Marin testified about the neck tattoo at trial (*id.*). Petitioner alleged counsel knew that he had tattoos on his forearms, biceps, wrists, and finger, but none on his neck (*id.* at 206, 220).

As previously noted, the state court held an evidentiary hearing on all of the claims presented in Petitioner's Rule 3.850 motion, and appointed counsel to represent Petitioner at the hearing (Ex. C2 at 257, 264, Ex. C3). At the hearing, Petitioner testified nine of the robbery victims told law enforcement they had no recollection of any identifying characteristics of any of the robbers (Ex. C3 at 314). Petitioner testified that a defense investigator with Third Eye Investigations drafted a report stating that four witnesses would testify about a tattoo on the "third" robber's neck (*id.* at 318, 320–21). Petitioner testified Attorney Charles Collins had the investigative report, and Petitioner asked Collins to depose those witnesses, so the jury could hear this description and then observe that Petitioner did not have a tattoo on his neck (*id.* at 314–16, 319–20, 324). Photographs of the right and left sides of Petitioner's neck were admitted at the evidentiary hearing, showing that there were no tattoos visible on either side (*id.* at 317–18).

Petitioner conceded that Claude Williams and Farren Longenecker did not testify at trial, and Petitioner conceded that although Mr. Freeman testified, he did not testify regarding a tattoo (Ex. C3 at 319–20). Petitioner testified that Lisa Marin testified the "third" robber had a tattoo on his neck (*id.* at 322). Petitioner testified he asked Attorney Collins three times during trial if he would allow him (Petitioner)

to display his neck, and Collins responded that Petitioner's doing so "would be testifying" (*id.* at 322–23).

Petitioner testified he asked Attorney Collins to pursue a misidentification defense based upon the tattoo (Ex. C3 at 325–26).  He testified he told Collins that the reason his fingerprint was at the store was because he and his then-wife, April Burke, frequented the store (*id.* at 326–28).  Petitioner testified April provided Petitioner's first defense attorney with a receipt from her debit card showing that a purchase was made at the store the day before the robbery (*id.* at 327–38).  Petitioner testified he did not know whether the receipt was in the defense files received by Attorney Collins (*id.* at 328).  Petitioner testified he told Collins about the receipt, and Collins spoke with April, but she could not provide the receipt because she was incarcerated at the time of their conversation (*id.* at 329).

Petitioner testified he also told Attorney Collins that April and his two sisters, Courtney Burke and Gabrielle Cook, would testify that he was someplace other than the store when it was robbed (Ex. C3 at 333–35).  Petitioner testified his sisters would have testified he was with them and his three children at a house on Highway 20 at the time of the robbery (*id.* at 360–61).

On cross-examination, Petitioner admitted he had thirty (30) prior felony convictions (24 of which were from the case at issue) (Ex. C3 at 353).

Courtney Burke testified that every morning during the summer of 2009, Petitioner came to the house where she and her sister lived between 8:00 and 9:00 a.m., and he brought his three children (Ex. C3 at 379–80). Ms. Burke testified Petitioner remained at the house continuously until 6:00 or 7:00 p.m. (*id.* at 380–81). The robbery occurred at noon. Courtney Burke testified she spoke to Petitioner's first attorney and "gave them my side of the story" (*id.* at 381–82). She testified she did not speak with Attorney Collins (*id.* at 381). Courtney Burke testified she appeared for trial but did not testify (*id.* at 383).

Gabrielle Cook provided the same testimony as Courtney Burke regarding Petitioner's whereabouts during the summer of 2009, i.e., that Petitioner came to the house where she and her sister lived between 8:00 and 9:00 a.m.; that he brought his three children; and that he remained at the house all day (Ex. C3 at 386–89). Ms. Cook testified she did not attempt to provide this information to any of Petitioner's defense attorneys, because Petitioner's then-wife April was "trying to be in control of everything and keep me and my other sister out of getting in contact with them" (*id.* at 389). On cross-examination, Ms. Cook testified she did not recall that Petitioner went to the Dollar General store on the day before the robbery (*id.* at 391–93). She testified that if anyone stated that Petitioner was at the Dollar General store the day before the robbery, that person would be wrong (*id.* at 393).

Attorney Charles Collins testified at the post-conviction evidentiary hearing

(Ex. C3 at 408–46).  Collins described his trial strategy as follows:

> My trial strategy was this.  We couldn't argue that he wasn't there.  I mean, you had the video of someone opening up this pack of gloves, they locate the package of the gloves, they have his latent on it.  To me, the issue was whether he would be culpable as charged in the information on all the counts, given that there were multiple people involved.
>
> My issue was going to be to try to argue independent acts of others, minimize his involvement as much as possible, minimize that it was this premeditated, planned-out scheme to go in there and that he was elaborately involved in it.
>
> I thought that if you got caught or bogged down in arguing other trivial things, that you would lose credibility potentially with the jury when you're in a situation where you're just trying to throw anything up that will stick.  In my experience, when you have that approach, somewhat of a shotgun approach, the jury doesn't find you credible and believable, so we had to try to stick to the most credible and believable theory of defense.  And that was this.

(Ex. C3 at 413).  Attorney Collins testified regarding the viability of pursuing a

misidentification defense:

> Q [by counsel for the State].  Have you had an opportunity to deal with robbery and other traumatic victims in the past concerning their IDs?
>
> A.  Yes, sir.
>
> Q.  Did you feel that any of the inconsistencies were going to be a viable defense concerning descriptions of the three co-conspirators?

A.  I didn't think they were end-all, be-all.  Obviously, they were something that had value to the defense's theory of the case.  They were brought out in cross-examination, when applicable, and argued in closing.

Q  Regardless, because of the three of them and because of being traumatic, did you feel that going with a misidentification was going to work since none of them had ID-ed the defendant?

A.    I didn't think it was the strongest argument.    The inconsistencies in the statements regarding tattoos or non-tattoos were brought out in cross.  Okay?  They were.

To say that we—first, it was never requested that we hammer home a misidentification defense.  But, based on his latent print being there, him being there, I just didn't feel that was the strongest defense to present.

Q.  Once again, you've talked about trying to maintain a good rapport with the jury.  Did you feel that mincing details and challenging the victims, people who you were not contesting had been victimized, might backfire on you concerning the jury's feelings about you and your client?

A.  Of course.

(Ex. C3 at 418–19).

Attorney Collins testified he attempted to contact Petitioner's wife, April

Burke, and Petitioner's sister, Courtney Burke, numerous times in an attempt to

determine whether they could provide information helpful to the defense, but he

never spoke to April Burke, and his attempt to meet with Courtney was unsuccessful

(Ex. C3 at 414–15).  Collins read a copy of a letter he sent to Petitioner, dated

October 17, 2011 (one week prior to trial), in which Collins explained his efforts to

speak with these potential witnesses (Ex. C3 at 415–16).  A copy of the letter was

admitted as evidence at the evidentiary hearing (Ex. C4).  The letter stated:

> Dear Mr. Burke,
>
> I'm having trouble with communication between myself, April, and your sister Courtney.  Since our last jail visit, I've called both of them multiple times and left messages.  Today, Courtney finally returned my phone call from last week, only to ask what time you had Court next week.
>
> I explained to her that it was imperative that I speak with her and April this week.  The purpose of such a meeting is to speak with them face to face to see how they may actually testify.  However, after several attempts, and even offers to meet them in Leon County, this has not happened, despite my best efforts.
>
> Please understand that if they cannot cooperate with us, then I do not believe it will be beneficial to use them as witnesses.
>
> I will be out to the jail this week to discuss some last minute things.  Additionally, I will be filing some motions this week (Motions in Limine regarding your statements about your prior record, drugs found at house, and federal charges).
>
> If you have any additional questions please do not hesitate to contact me.

(Ex. C4).

> With respect to an alibi defense, Attorney Collins testified:

> A.  This is the first time I've ever heard "alibi" out of this man's [Petitioner's] mouth is here today.  He never gave me alibi witnesses.

I find it incredibly coincidental if he has an alibi, has the potential to testify regarding where you were, and you still don't decide to testify to where you were.  He never gave me any alibi witnesses.  Never.

Q [by counsel for the State].  Did he ever say my sisters and my wife can testify that I was somewhere else?

A.  No.  No.  And, further, when I spoke to Ms. Courtney Burke, I wasn't clear what she was going to say at all because she never would speak with me.  I subpoenaed her out of an abundance of caution.  She was present during the trial.  I just find it incredible that if she was there during the trial, which she was, I distinctly remember, that if she could provide this alibi defense, she just chose not to testify about it, it seems to me, if he had an alibi.

. . . . [A]t any time when I met her [Courtney Burke] prior to trial, when I would press her, you know, we need to list you as a witness, she never said I'm going to provide an alibi or anything of that nature.  I never heard the word '"alibi"' or that they can put me [Petitioner] somewhere else until he said that here in court today.
. . . .
We have to file notice of alibi at least ten days prior to trial.  And when I received the case file, . . . which it might have even already been set for trial when we inherited the case, there hadn't been a notice of alibi filed at that point in time up until our representation.  And I had never been given an alibi, which I would have, in turn, filed a notice of alibi.

Q.  Were you ever brought credible evidence where you felt that raising an alibi defense and putting either one of those women on the stand would have been in your client's best interest?

A.  I was never given any alibi evidence.
. . . .
You review the evidence the State has, you speak to your client, see if he can provide you with a viable defense, if he didn't do it, how did it happen, where were you.

Like I said, I think we've already addressed the alibi issue. I spoke to the individual or attempted to speak to the individual she tried to put me in touch with. I had limited contact with Ms. Courtney Burke, who never provided any alibi information. He provided me with the name Naketa Alkawaja, the spelling is A-L-K-A-W-A-J-A, who after multiple attempts I was never able to speak to as well. And I tried to contact Ms. April Burke. And I never spoke to her personally, to my knowledge.

Q. Did you actually list them as potential—as defense witnesses in this case to put me on notice pursuant to discovery?

A. Yes, out of an abundance of caution.

Q. Regardless, are you going to put witnesses, particularly defense witnesses, on the stand when you don't know what they're saying or how that will fit into a defense?

A. No.

(Ex. C3 at 419–23).

On cross-examination by Petitioner's counsel, Attorney Collins testified as follows regarding his choice of defense strategy:

Q. Mr. Burke contends on the one hand that you didn't develop a defense, but in his motion he mentions the defense that you argued actually was that of minor role, which you testified to here today?

A. Yes, sir.

Q. But Mr. Burke asserts that he suggested to you and asked you to present a couple of different defenses. And let me put them in categories. First of all, as I understand your testimony, no alibi witnesses were ever provided to you, they did not contact you, you

made efforts to contact them, but nothing ever—it was never mentioned that anybody was an alibi witness?

A.  He gave me names of people to contact.  Never specifically stated they would provide an alibi.  Thorough follow-up with them regarding letters, offers to meet them wherever here in Leon County to go over their testimony, no one ever provided me with an alibi.

I further subpoenaed his sister Courtney Burke, for purposes of the trial.  Not as an alibi witness, because I didn't know what she was going to say, but he wanted her listed as a witness.  She sat through the trial.  She was here under subpoena.  Never at any point in time did she say I have an alibi, I want to speak on my brother's behalf.

Mr. Burke himself never indicated I want to testify because I was somewhere else.  There was just never a mention of any alibi.

Q.  Okay.  Then let's talk about the misidentification issue.  I agree with you that the fingerprint, assuming that the analyst and the experts got it right, shows that Mr. Burke was there.

A.  Yes, sir.

Q.  Why not go with the defense of Mr. Burke was there and we know that by fingerprints, but that's not him in the video and the State can't prove to you when he was in there, he could have been there three days prior?

A.  I had nothing to substantiate the fact that he was there three days prior.  This notion that there was a receipt from an ATM machine from Ms. Burke or anything like that, I just didn't have.  I had never heard that.  I had tried contacting Ms. Burke, never got that.  I mean for me to then put in front of the jury this statement that that's not him and he was there three days earlier, despite this physical evidence you have, but I have nothing to substantiate this claim, I think I would have lost a lot of credibility, whatever I had left, with the jury at that point in time.
. . . .

Q  So the copy of the receipts and the things like that, did Mr. Burke tell you about those?

A.  No, he never told me about a receipt.  He told me to talk to his wife, April.

. . . .

Which I tried to do.  I was never provided with a receipt.

In my speaking with Mr. Ward, previous defense counsel on the case, and Ms. Dias, who I did speak to prior to that, nothing was conveyed to me in terms of a receipt or ever any mention to them that, hey, here's this receipt.

I think that's something a defense counsel would have handed on to the next attorney if you have an actual physical piece of evidence that substantiates an alibi.

Q.  Did you discuss with Mr. Burke the realties, Mr. Burke, we've got to do some damage control here, we're going to shoot for minimizing what it is that your exposure is and what the jury may believe that you did?

A.  Yes, absolutely.

Q.  Did he protest that defense?

A.  No.

Q.  So he was aware of your strategy?

A.  Yes.  And I believe if you go back and actually read the transcript, you knew what our strategy was from the opening statement. David actually gave the opening statement at trial.  I can tell you that. In the opening statement, you could basically see where the theory of defense was going in that, yes, he's there, but he isn't the master mind of this, he isn't the main participant.

> So he knew—what I'm getting at is he knew from the beginning of the trial, before questions were posed to witnesses, what the theory of defense was. And not any time during the trial did he say I don't think this is working, we need to do something different.

(Ex. C3 at 433–36).

Attorney Collins testified he elicited testimony from Lisa Marin about the "third" robber's neck tattoo, and he implied that it was apparent to the jury that Petitioner did not have a tattoo on his neck.

> Q [by Petitioner's counsel (at the evidentiary hearing)]. If the witness testified that I believe the perpetrator that's associated as being Mr. Burke had tattoos on their neck—

> A. Right.

> Q. Why not go for the jugular there, you know, doesn't have any tattoos on his neck?

> A. I believe, in going back and looking at my notes, it is clear what she said, that he had tattoos. **She clearly said that the person had a tattoo on their neck.**

> **I didn't cross-examine her any further because I was very satisfied with that answer and the discrepancy of how it looked**.

> Now, if you're asking why he didn't show his neck or why he didn't testify, I can't answer that. He had the opportunity to.

(Ex. C3 at 439) (emphasis added). Attorney Collins testified he and Petitioner discussed the possibility of displaying Petitioner's neck to the jury (*id.* at 437–38).

Collins testified he did not know whether doing so would be considered testimonial or not, but he told Petitioner it was his decision (*id.*).

The relevant parts of the circuit court's order denying Petitioner's Rule 3.850 motion included the following (the undersigned includes the circuit court's discussion of several claims, because it provides additional context for the court's adjudication of the IATC claim at issue in Ground Two of the § 2254 petition):

> Defendant, Willie Burke was charged initially in a 28 count Information that was subsequently amended to 24 counts. The charges stem from a robbery at the Dollar General store in Tallahassee, Florida on July 18, 2009. Three masked men entered the store and detained the store personnel, the customers that were in the store and those customers that came to the store during the course of the robbery. The store cash register and safe were broken into and each individual victim was robbed. The victims were locked in the restroom resulting in the kidnapping charge.
>
> The first two robbers to enter the store wore dark clothing and ski masks over their faces. One of these robbers had a firearm. Both had on gloves. The third robber who entered the store last had a dark ski mask and lighter colored clothing.
>
> The surveillance tape showed the third robber entering the store wearing only one glove. The tape then shows him go to the area of the store where the gloves were sold. The robber is shown bending down behind the counter before emerging with gloves on both hands. Store [sic] and law enforcement viewed the tape on the day of the robbery. They immediately went to the area of the store seen on the video and located a package of three pair gloves that had been opened with one pair of gloves missing. Forensic testing discovered the Defendant's fingerprint on the packaging material. A search of the Defendant's

home revealed a ski mask, a firearm and clothing similar to that worn by the third robber at the time of the robbery.

. . . .

Under his Ground Two, Defendant alleges his counsel rendered ineffective assistance when he failed to exclude testimony of a ring that supposedly was taken from the Defendant by police during questioning. Defendant maintains that the police officer lied when he testified that Defendant inferred that the ring was his when he was shown a still photograph from the surveillance film of a ring on one of the robber's hands. A ring was taken from the Defendant but was lost before the trial and was never introduced into evidence.

Defendant maintains that because the ring was lost, the officer interviewing the Defendant could not testify as to the Defendant's statements made during the interview about the ring in the surveillance video. The Defendant's statement, not the ring itself was the evidence at issue. There was no discernible grounds upon which Defendant's statements to law enforcement after Miranda warnings could be excluded from testimony. The Defendant failed to establish ineffective assistance of counsel in his Ground Number Two.

Defendant's Third Ground is that his attorney should have taken the deposition of the store personnel and customers establishing that the "third" robber, presumably the Defendant, was described as having a tattoo on his neck.

Mr. Collins [one of Petitioner's trial attorneys] questioned Lisa Marin, a store employee about the tattoo. On page 246 of the transcript this exchange takes place:

Question:   Were you able to notice any distinguishing features of them?

Answer:   No. I just remember I think it was the last one, I'm not sure, but had like a tattoo.

Question:   Had a tattoo?

Answer:        Uh-huh.  Yes.

Through the next several pages of transcript Mr. Collins has Ms. Marin establish that the tattoo was large and was on his neck.  That this was the "third" robber and he was the one wearing the lighter clothes. Mr. Collins then argues at page 307 and 308 of the transcript the inconsistencies of the testimony.  Failure to take the deposition of the victims apparently did not hinder Mr. Collins from pointing out the inconsistencies in the testimony.  Defendant fails to show ineffective assistance of counsel in his Ground Number Three.

Ground Number Four is cumulative.  Mr. Collins pointed out the inconsistencies in the testimony and in his argument.

In Ground Number Five Defendant alleges that Mr. Collins was ineffective when he did not call the Defendant's wife and family members as alibi witnesses to testify at the trial.  This Ground may indeed support an ineffective assistance of counsel argument if an alibi defense was available and if an alibi defense had been made known to Mr. Collins, but it was not.  The letter from Mr. Collins to the Defendant introduced into evidence at the hearing showed, however, that Mr. Collins attempted to determine the testimony of the witnesses supplied by the Defendant but they were not cooperative.  Mr. Collins testified at the hearing that no alibi defense was ever made known to him.  The Defendant's wife, April, was at trial and available to testify.  The Defendant's sisters were apparently not at trial but testified at the hearing that Defendant was with them every minute of every day during the summer of 2009 and therefore could not have been at the Dollar General Store at the time of the robbery.  The Court does not find their testimony credible.

The Court finds that Mr. Collins was never informed of an alibi defense.  If an alibi defense had been presented to him there is no plausible reason why he would not have presented it through Defendant's family.

Mr. Collins brought out in testimony and argued to the jury the inconsistencies in the victim's testimony; he questioned the integrity of Mr. Cooper's (the jailhouse snitch) testimony; he argued that the DNA on the mask and clothing meant nothing since it was found in Defendant's home; he questioned the officers['] version of the testimony concerning the ring.  In short he touched on every conceivable inconsistency in the evidence; the lack of evidence and the conflict in the evidence.  Alibi testimony was never made known to him.  Defendant's wife and sisters were difficult to communicate with and Defendant's wife was available for trial if alibis had been made known.  Mr. Collins traveled to South Carolina to take the deposition of Mr. Cooper who would be a state witness.  He was prepared and did what he could to raise doubts about the state's case.

At the end of the day, the surveillance tape from the Dollar General store showed one robber opening a package of gloves.  The open package of gloves had one pair of gloves missing.  The Defendant's print was on the package.  That print, was the definitive evidence against the Defendant at trial.  Mr. Collins did everything he could to raise a reasonable doubt as to the guilt of the Defendant.  The Defendant has failed to show that he had ineffective assistance of counsel.  Defendants [sic] motion for new trial based on ineffective assistance of counsel is denied.

(Ex. C2 at 272–76).

In Petitioner's initial brief on appeal of the circuit court's decision, counsel argued the trial court erred in denying Petitioner's IATC claim based upon Attorney Collins' failure to present a misidentification defense by displaying Petitioner's neck to the jury (Ex. C6 at 2, 14–15, 21–27).  The First DCA affirmed the circuit court's decision without any discussion (Ex. C8).

In *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 200 L. Ed. 2d 530 (2018), the Supreme Court held that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment or rejecting the same claim, federal habeas courts should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. *Id.* at 1192. The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.*

Fairminded jurists could agree with the state court's determination that Attorney Collins was not ineffective for failing to pursue and present a misidentification defense based upon the neck tattoo. There are "countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 691. "Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach. *Id.* "Counsel was entitled to formulate a strategy that was reasonable at the time . . . ." *Richter*, 562 U.S. at 107 (citations omitted).

Here it would be well within the bounds of a reasonable judicial determination for the state court to conclude that Attorney Collins reasonably followed a strategy that did not require him to present a misidentification defense. From the perspective

of Attorney Collins when he was preparing Petitioner's defense, Collins knew that the most damaging evidence against Petitioner was (1) the store's surveillance tape which showed that the last robber to enter the store stopped at the end of an aisle, took something off the shelf, walked a little further down the aisle, bent down, and then appeared to be wearing gloves on both hands; (2) testimony from Lieutenant Butler that she watched the video, went to the aisle where the robber went, saw a wrapper which had been torn off a package of gloves, and directed Detective Punausuia to collect the package; (3) testimony from Detective Punausuia that he collected the open package of gloves from the shelf, observed that gloves were missing, and recovered one latent fingerprint; and (4) testimony from Felicia Bowen, a latent print examiner with the sheriff's office, that she compared the fingerprint recovered by Detective Punausuia with Petitioner's fingerprints, and identified the fingerprint as Petitioner's right little finger (*see* Ex. C4 at 136–37, 140, 144–47, 168–72).

Attorney Collins also knew that the fingerprint evidence was not the only evidence of Petitioner's participation in the robbery.  Collins knew that the jury would hear Deputy Chaires' testimony, that when he showed Petitioner a picture of the robber who initially had an ungloved hand, and Chaires pointed out the fact that there appeared to be a piece of jewelry on the ungloved hand, Petitioner indicated,

"My ring?"  Collins knew that the jury would also hear Deputy Reeves' testimony that he recovered a ski mask from Petitioner's home (as the state court noted, the victims testified that all three robbers wore ski masks).  And Collins knew that the jury would hear testimony from Gary Cooper, Petitioner's former cellmate at the Leon County Jail, that Petitioner admitted to robbing the Dollar General Store.

But Attorney Collins did not exclude other potential defenses.  He attempted to speak with Petitioner's sister Courtney, and his then-wife April, to determine if they were aware of any exculpatory information, but neither of them communicated such information to Collins.   Additionally, Attorney Collins did not completely exclude a misidentification defense based upon the tattoo.  As the state court noted, Attorney Collins elicited testimony from Lisa Marin that the "third" robber had a tattoo on his neck, and that it was large enough that she could see it at a glance:

> Q [by Attorney Collins].   Were you able to notice any distinguishable features of them?
>
> A.  No. I just remember I think it was the last one, sure, but had like a tattoo.
>
> Q.  Had a tattoo?
>
> A.  Uh-huh.  Yes.
>
> Q.  I know it's hard to remember everything, but when the last one, are you referring—

A.  The last person that came in had a tattoo.

Q.  Okay.  So the last person is also what [sic] you've referred to as the third person?

A.  He's the only one that I could remember seeing something physically like, you know, on their body.
. . . .

Q.  What kind of tattoo did he have?

A.  I don't know what it was.  I just think it was on the neck.

Q.  Is it safe to say that while all this is going on, it kind of happens quickly?

A.  Yes.

Q.  You don't remember a lot of details, obviously?

A.  Well, you know, with the robbery, what we're supposed to do as employees is to like look at key things as, you know, it's going on.  So I mean, as I try to look at everybody who was coming in the door, I just try to pinpoint certain things that maybe I can remember.

Q.  Yes, ma'am.  I understand.  But, this last person that you saw come in, you're sure they had a tattoo on their neck?

A.  I glanced and I seen [sic]—yes.

Q.  So, obviously, if you just glance at it for a second, it was probably a rather large tattoo if you could notice it?

A  Yes, it was kind of big.

Q.  Where exactly on his neck do you remember it being, if you recall?

A.  I don't know what side.  I don't remember what side, but it was like right there.

Q.  And pretty big?

A.  I think so.  I mean, I could see it.  So, yes.

(Ex. C4 at 246–48).

Additionally, during Collins' cross-examination of Gary Cooper, the "jailhouse snitch," Collins elicited testimony suggesting that Cooper could have been the "third" robber.  Attorney Collins elicited Cooper's admission that he had already received an eight-year sentence reduction for assisting the government in another case, as well as Cooper's admission that he was hoping for an additional sentence reduction for testifying in Petitioner's case (Ex. C4 at 104–05).  Collins also asked Cooper, "One last question.  Do you have a tattoo on the left base of your neck?" (*id.* at 109).  Cooper responded, "Yes." (*id.*).

Petitioner contends Attorney Collins should have further pursued the misidentification defense by preserving and presenting testimony from Farren Longenecker and Claude Williams.  However, Petitioner did not submit any evidence of either of these witness' pre-trial statement or observation (for example, the pre-trial statements themselves, affidavits or testimony from these witnesses, or testimony from the investigator(s) who allegedly took the statements) to the state

court when he had the opportunity to do so during the Rule 3.850 proceeding.  *See*

*Cullen v. Pinholster*, 563 U.S. 170, 181, 185 n.7, 131 S. Ct. 1388, 179 L. Ed. 2d 557

(2011) (holding that when the state court has decided an issue on the merits, review

under § 2254(d) is limited to the record that was before the state court and the

evidence presented in the State court proceeding).

There is no question that Attorney Collins could have gone the extra step of

formally displaying Petitioner's neck to the jury, instead of relying upon their ability

to informally observe him during the two-day trial, but that is not the issue in this

federal habeas case—the issue is whether it is possible that fair minded jurists could

disagree that the state court's determination, that Attorney Collins' handling of the

"misidentification" defense was sound trial strategy, is inconsistent with *Strickland*.

*See Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010) ("[C]ounsel cannot be

adjudged incompetent for performing in a particular way in a case, as long as the

approach taken might be considered sound trial strategy.").  The undersigned

concludes that fair minded jurists could disagree on this issue, and because such

disagreement is possible, Petitioner's IATC claim presented in Ground Two must be

denied.  *See Richter*, 562 U.S. at 102; *Nance v. Warden, Ga. Diagnostic Prison*, 922

F.3d 1298, 1301 (11th Cir. 2019) ("To justify federal habeas relief, the state court's

decision must be so lacking in justification that there was an error beyond any

possibility of fairminded disagreement.") (quotation marks omitted and alteration adopted).

B.   <u>Ground Eleven:   "Trial counsel was ineffective for interfering with Burke's right to testify, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."</u>

Petitioner alleges his decision not to testify on his own behalf was the product of misadvice by Attorney Collins (ECF No. 1 at 52–54).  Petitioner alleges Collins advised him not to testify, even though his testimony was "necessary to test the State's case" (*id.*).  Petitioner also alleges Collins advised him that the nature of his prior convictions would become known to the jury if he testified (*id.*).  Petitioner sets forth the facts to which he would have testified,[3] and asserts there is a reasonable probability his trial would have had a different outcome if he had testified (*id.* at 54).

---

[3] Petitioner alleges he would have testified:  (1) he was not involved in the robbery; (2) he was with his children at the time of the robbery; (3) he was in the Dollar General store the day before the robbery; (4) his presence in the store was "not odd" because his wife's mail carrier route was in that area; (5) he worked construction; (6) he touched several packages of gloves while looking for gloves suitable to wear to work; (7) he owned the ski mask for work purposes; (8) he never told Gary Cooper anything about his case and never admitted to involvement in the robbery; (9) Cooper had time and opportunity to look through Petitioner's legal work in the cell while he was not in the cell; (10) upon viewing the photographs of the robbery, Burke could not determine whether one of the robbers was wearing a ring, let alone that it resembled his own ring; and (11) his question to Deputy Chaires about his ring was not an admission; instead, it was an expression of shock that Chaires implied he was guilty solely because he was wearing a ring, and the robber looked as if he might be wearing one (ECF No. 1 at 52–53).

Petitioner alleges he presented this IATC claim as Ground 11 in his Rule 3.850 motion and argued it at the evidentiary hearing, but the circuit court did not rule on it in its written order (ECF No. 1 at 54–55). Petitioner alleges he appealed the circuit court's failure to rule on the claim, but the First DCA affirmed the lower court's decision (*id.* at 55). Petitioner contends if this federal court determines he did not fully exhaust this claim, he is nevertheless entitled to federal review under *Martinez* (ECF No. 1 at 56; ECF No. 46 at 42–47).

Respondent contends Petitioner presented a "substantially abbreviated" claim in Ground 11 of his Rule 3.850 motion (ECF No. 40 at 30–32, 95). Respondent contends Petitioner's Rule 3.850 motion did not include all of the details of his proposed trial testimony that he included in his § 2254 petition; therefore, those details constitute unexhausted grounds which are now procedurally barred (*id.*). Respondent contends even assuming Petitioner's claim was exhausted, he would not be entitled to federal habeas relief (*id.* at 95–104).

The state court record demonstrates that in Ground 11 of Petitioner's Rule 3.850 motion, he claimed that defense counsel was ineffective for advising him to waive his right to testify on his own behalf (Ex. C2 at 219–21). Petitioner contended counsel should have advised him that his testimony was important and necessary, because there was no other evidence of his innocence (*id.*). Petitioner alleged if

counsel had correctly advised him, he would have testified that Gary Cooper, his former cellmate, obtained information about the case from documents in their cell (*id.*).  Petitioner alleged the jury would have seen and heard that he had no tattoos on his neck; and although he had "many" tattoos on his forearms, biceps, wrists, and finger, the victims would have seen them, because the "third" robber was wearing a short-sleeved shirt (*id.*).  Petitioner alleged he also would have testified he was in the Dollar General store the day prior to the robbery, which would have explained how and when his partial fingerprint was there (*id.*).  And Petitioner alleged he would have testified he owned a face mask "for work purposes" (*id.* at 220).  Petitioner alleged he also would have told the jury his whereabouts during the time of the robbery, and then his "corroborating witnesses" could have testified to the same (*id.* at 220–21).

As previously noted, the circuit court granted an evidentiary hearing on all fourteen of Petitioner's post-conviction claims, expressly finding that Petitioner set forth a prima facie showing of entitlement to relief (*see* Ex. C2 at 257).  Following the evidentiary hearing, the court denied Petitioner's Rule 3.850 motion, but did not expressly address Ground 11 in its written order (*id.* at 272–76).  The entire trial transcript and the transcript of the post-conviction evidentiary hearing were part of the post-conviction record (*see* Exs. C3, C4).

In Petitioner's initial brief in the post-conviction appeal, he presented three arguments, the third of which was that the circuit court erred by failing to enter a written disposition of four of his IATC claims, including Ground 11 (Ex. C6 at 28). Petitioner argued the First DCA should reverse the circuit court's order with directions to address those four IATC claims (*id.*). Petitioner did not argue the merits of Ground 11 (*id.*).

The First DCA affirmed the circuit court's denial of Petitioner's Rule 3.850 motion without comment (Ex. D4). By doing so, the appellate court implicitly determined that Petitioner's claims were conclusively refuted by the record. *See O'Steen v. State*, 247 So. 3d 88 (Fla. 1st DCA 2018) ("In order to uphold the summary denial of claims raised in a motion pursuant to Florida Rule of Criminal Procedure 3.850, 'the claims must be either facially invalid or conclusively refuted by the record.'") (quoting *Crumitie v. State*, 842 So.2d 271, 273 (Fla. 1st DCA 2003)).

As an initial matter, the undersigned concludes that Petitioner fairly presented the state courts with the IATC claim presented in Ground Eleven. Additionally, the undersigned concludes that the state courts adjudicated the merits of the claim. Section § 2254(d) does not require a state court to give reasons before its decision may be deemed to have been "adjudicated on the merits." *See Richter*, 562 U.S. at

99.  When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Id.*  The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely.  *Id.* at 99–100.  The same rule applies when the state court addresses some but not all of the federal claims raised by a defendant.  When a federal claim has been presented to the state court, and the state court opinion addresses some but not all of defendant's federal claims, a rebuttable presumption arises on federal habeas review that the state court adjudicated all of the federal claims on the merits.  *See Johnson v. Williams*, 568 U.S. 289, 301, 133 S. Ct. 1088, 185 L. Ed. 2d 105 (2013).

Here, the circuit court held an evidentiary hearing on <u>all</u> of Petitioner's IATC claims, and it did not reject any of Petitioner's claims on procedural grounds.  The fact that the circuit court expressly addressed only some of Petitioner's IATC claims in its written decision does not mean that it failed to adjudicate the others.  Further, the First DCA did not apply a procedural bar.  And Petitioner has not otherwise rebutted the presumption that the First DCA adjudicated the merits of the IATC

claim presented in Ground Eleven  Therefore, § 2254(d) applies to the First DCA's decision. *See Richter*, 562 U.S. at 100; *see also Shelton v. Sec'y, Dep't of Corr.*, 691 F.3d 1348, 1353 (11th Cir. 2012) (where state appellate court did not apply a procedural bar, the federal habeas court is compelled to presume that the court's one-word per curiam affirmance was an "adjudication on the merits" entitled to AEDPA deference).

### 1.    Clearly Established Federal Law

The *Strickland* standard applies to this claim.

### 2.    Federal Review of State Court Decision

Because neither the First DCA nor the circuit court accompanied its adjudication of Ground Eleven with an explanation, Petitioner must show there was no reasonable basis for the state court to deny relief.  *See Richter*, 562 U.S. at 98. Petitioner has failed to satisfy this burden.

In Petitioner's Rule 3.850 motion, he alleged his decision not to testify was based upon Attorney Collins' failure to advise him of the importance and necessity of his testimony (*see* Ex. C2 at 245–46).  Petitioner repeated that assertion in his § 2254 petition (ECF No. 1 at 52–53), but he added a second reason underlying his decision not to testify, that is, Collins misadvised him that the jury may learn the nature of his prior convictions (*id.*).

But during Petitioner's sworn testimony at the post-conviction evidentiary hearing in state court, Petitioner stated that his decision not to testify was based solely upon the following factor:

> Q [by Petitioner's post-conviction counsel].  Okay.  So it didn't make any difference to you whether a jury learned that you were a convicted felon or had offenses that involved dishonesty?
>
> A.  No, sir.  We all make mistakes.
>
> Q.  . . . [W]hy did you elect not to testify, given what you just said, that you would have testified no matter what?
>
> A.  Because he [Attorney Collins] told me, look at your jury, look at you, your jury's white, you're black, and that's [referring to the prosecutor] the sheriff's family member.
>
> Q.  Okay.  And so you are saying that he unduly influenced you or coerced you into not taking the witness stand . . . ?
>
> A.  Yes, sir.
>
> Q.  Okay.  And in the absence of him making comments to that effect, you would have taken the stand in your defense?
>
> A.  Yes, sir.

(Ex. C3 at 345–46).

On cross-examination, Petitioner confirmed that Attorney Collins' alleged comment was the only reason he chose not to testify:

> Q.  It's your testimony that Mr. Collins said you're black, look at that jury, they're white, I'm [the State's post-conviction counsel was

also the prosecutor during Petitioner's trial] the sheriff's son, so I think you shouldn't testify; that's your testimony?

A.  I didn't say you was the sheriff's son.

Q.  That I'm the sheriff's family or something like that?

A.  Yes.

Q.  Mr. Collins said that to you as it relates to whether you should testify?  That was his advice?

A.  He told me that before trial.

Q.  Okay.  Do you remember talking to Judge Hankinson on the record?

A.  About what?  Yes, when I told him, yes.

Q.  You agree that he told you it was your right to testify, nobody else's decision but yours alone?

A.  I understand that clearly.

Q.  And you were under oath, sworn under oath?

A.  Like I'm under oath right now, yes, sir.

Q.  And you told him—you didn't tell him that my lawyer said because I'm black, I shouldn't testify?

A.  Now, you're making it a race issue.  I took it as he was doing it the best for me.  That's why I said that.

Q.  But you agree you didn't bring up any of these conversations you're alleging now with Judge Hankinson on the record during trial?

A.  No, sir, because I followed the instructions of my lawyer.

Q.  And when Judge Hankinson asked you if it was your decision not to testify, you said that's your decision alone?

A.  Yes, because my counsel, I trusted his ability that he knew what was best for me.

Q.  Now, . . . was there anything else he had to say about your testifying other than what we've talked about?

A.  Other than that they would bring up my past, which I understood that.

Q.  But you didn't care about bringing up your past?

A.  Why not?  I done had it [sic] since I was a kid.

Q.  So the criminal side of it, the bringing up your past was not what kept you from testifying?

A.  I live with that every day.

Q.  Okay.  What kept you from testifying is what we talked about, about—you're the one who brought up the black/white thing and because my family is with the sheriff's office.  That was basically the reason you didn't testify is that he advised you and his reason that he recommended that you didn't is because look at the jury, look at you, that's the sheriff's family, and you bought into that argument?

A.  Yes.

(Ex. C3 at 371–73).

Attorney Collins testified as follows with respect to his discussing Petitioner's

right to testify:

Q [by counsel for the State at the post-conviction hearing and during Petitioner's trial]. During the trial, do you have a standard practice concerning the defendant's right to testify?

A. I made sure they're informed of the pros and cons of it.

Q. Did you discuss with Mr. Burke the pros and cons of him testifying in this case?

A. I'm sure I did. I mean, I think he elaborated on that through his own testimony.

Q. At any point, did you tell him anything about that race should be a consideration or my family business should in any way be a factor in whether he should testify?

A No. That's just—I don't know where that come [sic] from. I think the court and counsel know I wouldn't make such a statement.

Q. Regardless, have you practiced in front of Judge Hankinson on numerous occasions?

A. Yes.

Q. Does he do a thorough and sworn colloquy with the defendant before—once you tell the Court whether your client is going to testify, does he ask that that be done outside the hearing of the jury so he can do a colloquy?

A. Yes. It's not even required by the rule, but he's very thorough and makes sure it's done. And it was done in that case.

Q. In this case, did you advise, tell Mr. Burke how to answer Judge Hankinson's questions?

A. No, not at all.

. . . .

Q [by Petitioner's counsel].  On the issue of Mr. Burke testifying
or not testifying, I heard your testimony that you would not have said
what Mr. Burke attributes to you.  And I also heard Mr. Campbell
question is there a routine that you go through.  Do you recall
specifically what you told Mr. Burke may hurt him, may help him about
him testifying?

A.  Not specifically.  I knew that he had a past, obviously, since
he had just gotten sentenced in federal court.  I don't remember
speaking about it in any particularity, but I'm sure I would have talked
to him about priors, things of that nature.

(Ex. C3 at 424–25, 436).

As discussed *supra*, the trial transcript was part of the state post-conviction

record (*see* Ex. C3 at 448–49, Ex. C4).  The transcript includes the following

colloquy regarding Petitioner's decision not to testify:

THE COURT:  All right.  Is Mr. Burke ready to answer questions
as to his desire to testify or not?

MR. CHUCK COLLINS:  Yes, sir.

THE COURT:  Would you stand, please, Mr. Burke?

(DEFENDANT SWORN)

THE COURT:  State your name for the record, please, sir.

THE DEFENDANT:  Willie James Burke, Jr.

THE COURT:  Mr. Burke, Mr. Collins has indicated that you do
not desire to testify.  Is that correct?

THE DEFENDANT:  Yes.

THE COURT:  I beg your pardon?

THE DEFENDANT:  Yes.

THE COURT:  You may wonder why I ask you this.  We've had some defendants come back after the fact and indicate that they were confused about their right to testify.  Some of them have said their attorney told them they could not testify or somebody told them they could not testify or there was some confusion about that.

I tell you that you have an absolute right to testify if you wish. You have a good attorney and you should talk with him about your decision, but, ultimately, he's not the one on trial.  You're the one on trial.  And only you can decide whether you wish to testify or not.

Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Has anybody pressured you into not testifying?

THE DEFENDANT:  No, sir.

THE COURT:  Anybody told you that you could not testify?

THE DEFENDANT:  No, sir.

THE COURT:  Do you understand you have an absolute right to testify if you want to?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you wish to testify?

THE DEFENDANT:  No, sir.

THE COURT:  All right.  Now, we haven't quite finished with the State's case, we've got two more witnesses to present.  You have a right to change your mind up until the time we tell the jury that all the evidence has rested [sic].

I'm not going to ask you again, but if you should change your mind, you need to bring that immediately to Mr. Collins' attention and he'll bring it to my attention.  Do you understand?

A.  Yes, sir.

(Ex. C4 at 228–30).

At the close of the State's case, the court inquired again:

THE COURT:  Are you going to have testimony?

MR. CHUCK COLLINS:  No, Judge.

THE COURT:  All right. Is that still your position, Mr. Burke?

THE DEFENDANT:  Yes, sir.

(Ex. C4 at 257).

The Eleventh Circuit has explained trial counsel's responsibilities regarding

a client's right to testify as follows:

In *Teague*, we specifically delineated the duties of a trial counsel with respect to a defendant's right to testify.  Counsel must advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify.  *Id.* at 1533.

*McGriff v. Dept. of Corr.*, 338 F.3d 1231, 1237 (11th Cir. 2003) (citing *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992)).  "[I]f defense counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify."  *Teague*, 953 F.2d at 1533.

Considering Petitioner's sworn testimony at the post-conviction evidentiary hearing, that the sole reason he chose not to testify was Collins' comment that Petitioner was a different race than the jurors, and the prosecutor was a member of the sheriff's family; and considering Petitioner's testimony that he did not interpret the alleged comment as "a race issue" but as Collins' advice that he believed it was in Petitioner's best interest not to testify; and considering Attorney Collins' adamant denial that he made the racial comments attributed to him by Petitioner; and considering Petitioner's sworn statements during the plea colloquy, the state court reasonably concluded Petitioner failed to demonstrate that his decision not to testify was based upon deficient advice by counsel.[4]

---

[4] Even though Petitioner testified at the evidentiary hearing that Attorney Collins' advice regarding his prior convictions did not influence his decision not to testify, it is worth noting that Petitioner did not show that Attorney Collins affirmatively misadvised him on this subject. Although Florida law typically prevents the State from asking questions about the specifics of a criminal defendant's prior convictions, the State nonetheless could have asked Petitioner about his

Petitioner has not demonstrated that the state court's rejection of Ground Eleven was contrary to or an unreasonable application of *Strickland*. Therefore, he is not entitled to federal habeas relief on Ground Eleven.

---

criminal history generally, and could have elicited specifics if Petitioner opened the door. In particular, under Florida law, a party may attack the credibility of any witness, including the accused in a criminal prosecution, with evidence that he has been convicted of a felony or a crime that involved dishonesty or a false statement. *See Stallworth v. State*, 53 So. 3d 1163, 1165 (Fla. 1st DCA 2011). The witness may be asked whether he has ever been convicted of such a crime and, if so, how many times. *Id.* If the witness responds truthfully, the questions about his criminal history must cease, but if he denies a conviction, he may be impeached with a certified record of the conviction. *Id.* According to Petitioner's sentencing scoresheet in the state case, he had five prior state felony convictions (armed robbery, burglary of a dwelling, burglary, possession of a firearm by a convicted felon, and grand theft) (*see* Ex. B1 at 109). At the time of Petitioner's trial, he had also been convicted of one federal felony (possession of a firearm by a convicted felon). *See United States v. Burke*, Case No. 4:09cr63, Judgment, ECF No. 42 (N.D. Fla. June 30, 2010). Even if Attorney Collins told Petitioner that the nature of his prior convictions could be revealed, this was not affirmative misadvice, because he was correct that Petitioner's felony criminal history could come out, as well as his history of crimes involving dishonesty such as theft, if he testified and, further, that the details of that history could come out if Petitioner opened the door.

With respect to Petitioner's allegation that counsel failed to advise him that his testimony was necessary to refute the State's case, an allegation which he apparently abandoned as evidenced by his evidentiary hearing testimony that the race comment was the only reason he did not testify, Petitioner proffers a laundry list of facts to which he allegedly would have testified. But Petitioner did not allege he told Attorney Collins all of these facts; and even if he did, there was no evidence to corroborate them. Petitioner discussed his first defense attorney's having a receipt, but Attorney Collins testified he never found any evidence of its existence. Petitioner told Collins to contact his wife and sister, but they did not cooperate in providing any exonerating information, and the testimony of one of Petitioner's sisters actually refuted Petitioner's explanation as to why his fingerprint was found at the store. A reasonable attorney could have advised his client not to testify if the testimony would have presented a theory that was lacking corroboration, somewhat implausible, and obviously self-serving. Especially when doing to would have exposed the jury to the fact that Petitioner was a six-time convicted felon. *See, e.g., Gordon v. Sec'y, Dep't of Corr.*, — F. App'x —, 2019 WL 3564471, at *3 (11th Cir. 2019) ("A reasonable attorney could have elected to focus the jury's attention on a theory plausibly supported by the evidence as opposed to one lacking any support.").

C.     Ground One:  "Trial counsel was ineffective for conceding Burke's guilt, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."

Petitioner alleges co-counsel David Collins "set the stage" for conceding Petitioner's guilt by telling the jury during opening statements that it was understandable if they believed that Petitioner was present at the crime scene (ECF No. 1 at 5–7).  Petitioner alleges defense counsel developed this theme throughout trial, and "drove this concession defense home" during closing arguments (*id.*).  Petitioner contends counsel's decision to concede Petitioner's guilt was deficient trial strategy, especially in light of the fact that there was not overwhelming evidence of his guilt (*id.*).  Petitioner contends absent defense counsel's concession, there is a reasonable probability of a different outcome at trial (*id.*).  Petitioner concedes he did not present this IATC claim in his Rule 3.850 motion (*id.* at 8).  He contends he is entitled to federal review under *Martinez* (*id.* at 8–9).  Petitioner also alleges he is "actually innocent," thus the federal court's failure to review his claim would result in a fundamental miscarriage of justice (*id.* at 9).

Respondent contends Petitioner's claim is procedurally barred from federal review, because he did not present it to the state courts (ECF No. 40 at 8).  Respondent contends Petitioner is not entitled to federal review under *Martinez* because his underlying IATC claim is not "substantial" (*id.* at 9–10).  Respondent

additionally contends Petitioner does not qualify for the "actual innocence" exception to the exhaustion requirement, because he has not presented any new, reliable evidence to establish his factual innocence (*id.* at 10).

In Petitioner's reply, he contends his IATC claim is "substantial" (ECF No. 46 at 1–4). With respect to the "actual innocence" exception, Petitioner states,

> The Petitioner would note that although he does not have the "new, reliable evidence" needed to excuse a procedural default under the "actual innocence" exception, his claims are rooted in his "actual innocence."

(ECF No. 46 at 1 n.1).

Considering Petitioner's concession of lack of exhaustion, the court will determine whether he has shown he qualifies for a federal merits review of Ground One through *Martinez* or the "actual innocence" exception.

In *Martinez*, the Supreme Court recognized that a habeas petitioner may establish cause for a procedural default of a claim of an IATC claim in the following circumstances:

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have

been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

566 U.S. at 14.   Accordingly, the petitioner must "establish that his collateral counsel's conduct 'fell below an objective standard of reasonableness,' and that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"   *Hittson v. GDCP Warden*, 759 F.3d 1210, 1262 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 688).

In *Hittson*, the Eleventh Circuit explained:

> [T]he merits of the underlying claim is only a part of the *Strickland* analysis.  With unlimited time and the benefit of hindsight, a petitioner can come up with any number of potentially meritorious ineffective-assistance claims that he now wishes his collateral counsel had raised.  However, a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims.  *Murray*, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.").  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983).  "[A] per se rule that . . . the professional advocate, [is not] allowed to decide what issues are to be pressed . . . seriously undermines the ability of counsel to present the client's case in accord with counsel's professional evaluation."  *Id.* at 751, 103 S. Ct. at 3313.

> As we have explained, *Strickland* instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance"—that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689–90, 104 S. Ct. at 2065–66. To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Thus, to show that his habeas counsel failed to provide the level of representation required by *Strickland*, [the petitioner] must show more than the mere fact they failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

*Hittson*, 759 F.3d at 1263 (footnote omitted). The Eleventh Circuit then explained

*Martinez*'s "substantial claim" requirement as requiring a petitioner to demonstrate

that "jurists of reason would find it debatable whether the petition states a valid claim

of the denial of a constitutional right." *Hittson*, 759 F.3d at 1269–70 (citations

omitted).

Here, Petitioner has not shown that his post-conviction counsel failed to

provide the level of representation required by *Strickland* by failing to amend the

Rule 3.850 motion to add an IATC claim based upon trial counsel's allegedly

conceding Petitioner's guilt.

In *Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004),

the Supreme Court made clear that an attorney does not have the authority, without

his client's explicit consent, to enter a guilty plea on behalf of a client, but that

counsel's concession of some level of guilt at trial is not the functional equivalent of a guilty plea. 543 U.S. at 187–88. The Court explained that despite the concession of guilt by counsel in Nixon's case, Nixon retained the rights accorded a defendant in a criminal trial, including the right to have the State prove every element of the offense beyond a reasonable doubt. *Id.* at 188. The Court also explained that a concession of guilt was not presumed to be deficient performance, and under *Strickland*, the defendant still must prove "counsel's concession trial strategy was unreasonable." *Id.* at 189. Additionally, where counsel's concession of guilt "does not rank as a failure to function in any meaningful sense as the Government's adversary," *Cronic*'s presumption of prejudice does not apply, and the petitioner must demonstrate prejudice under *Strickland*. *Nixon*, 543 U.S. at 190 (internal quotation marks and citation omitted). The Court found that Nixon had not shown he received ineffective assistance of counsel when counsel acknowledged, during the guilt phase of his capital trial, that Nixon caused the victim's death, but urged the jury to focus on the penalty phase and recommend life in prison instead of death by electrocution. *Id.* at 182–83. Although *Nixon* was a capital case, the principles set forth still apply in the non-capital context.

As the Eleventh Circuit noted in *Darden v. United States*,

> Any competent trial lawyer understands that in order to mount a successful case before a jury, credibility must never be sacrificed. To retain credibility, defense counsel must often make concessions that, viewed narrowly, may appear detrimental to the client's cause.

708 F.3d 1225, 1229–30 (11th Cir. 2013).

As discussed *supra* in Ground Two, Petitioner's defense counsel knew that the jury would see the store's surveillance videotape, hear testimony that Petitioner's fingerprint was found on the package of gloves apparently opened by the robber, hear testimony that a ski mask was found in Petitioner's home, and hear testimony that Petitioner admitted his involvement in the robbery to one of his cellmates. Anticipating this evidence, Attorney David Collins asserted during opening statements:

> Ladies and gentlemen, when you watch the evidence on the video, when you listen to the testimony of the witnesses, you will see that the evidence will not prove that Willie Burke did the things they've charged him with.

> You look at it matter of fact. Okay? There's a fingerprint from a pinkie, what the State alleges. There's some DNA. You judge that through what the experts say. You judge that as what they say and you listen to all the questions and answers that they give.

> What we believe the evidence is going to show, first of all, is that there are real questions that Mr. Burke was even there. But if you believe he was, and I can understand that, that his involvement, what he actually did, is not evidenced by the law for what he's charged.

There's not going to be any evidence that he ever possessed a
firearm.  There's not going to be any evidence that, if you find, again,
it's him—and we can argue in the alternative—there's not going to be
any evidence that he put anybody in a back room and confined them.
There's not.

There's not going to be any evidence that he took any money
from anyone.  The evidence will show that the perpetrators who
committed this crime, the actual crimes that are charged, are still at
large.  And you will see that with your own eyes.

(Ex. C4 at 25–26).

Throughout defense counsel's cross-examination of witnesses and during

closing arguments, counsel pursued the theory that even if there was evidence

suggesting Petitioner was in the store, there was not sufficient evidence he was guilty

of the crimes.  Counsel summarized this theory in closing argument:

My co-counsel said two things to you in opening, because I
believe in having candor when I'm talking.  Can I look at you in the
face and tell you that you cannot believe that possibly Mr. Burke was
in that store?  No.  If you want to believe the science, which I would
first submit to you is unreliable, because the only real science, when
you break it down, and all the other integral evidence, is the fingerprint.
The DNA doesn't prove anything.  Mr. Cooper doesn't prove anything.
I would be insulted by having to listen to him.  The fingerprint.  The
fingerprint, you had 20 possible matches.  They already had a suspect.
Okay.  But if you want to believe the science, and put him in that store,
based on that fingerprint and fingerprint alone, then you really have to
start asking questions of what did he actually do when he was there.
. . . .
Ladies and gentlemen, it's [evidence to support Petitioner's guilt
under the principal theory] just not there.  I can look you in the eyes
and tell you that.  You learned in jury selection that this is the court in

which the highest burden in the land stands, beyond every reasonable doubt. Has the State proven their case as to each material allegation in this? No. You can't use the principal theory as a catch-all.

(Ex. C4 at 310, 312).

Anticipating the testimony and physical evidence that the State would present against Petitioner at trial, a competent defense attorney may want to concede possible theories which the evidence may support, in order to maintain credibility with the jury. That is all that defense counsel did in Petitioner's case, and it was by no means an unreasonable trial strategy.

Furthermore, jurists of reason would not find it debatable whether Petitioner has stated a valid claim of prejudice. Petitioner has not made a valid showing that there is a reasonable probability the result of his trial would have been different if defense counsel had not conceded the *possibility* of Petitioner's presence in the store.

Petitioner has failed to show that the IATC claim asserted in Ground One is a "substantial one" under the standard described in *Hittson*. Therefore, Petitioner is not entitled to federal review of Ground One under *Martinez*.

Petitioner is also not entitled to review under the "actual innocence" exception. As discussed *supra*, to demonstrate actual innocence, the petitioner must show that there is new evidence and that, "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."

*McQuiggin v. Perkins*, 569 U.S. 383, 386, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013) (quotation marks omitted); *see also Schlup*, 513 U.S. at 324 (stating that new, reliable evidence that was not presented at trial must support a claim of actual innocence for the claim to be credible).  Here, Petitioner concedes he does not have new, reliable evidence to support his actual innocence claim (*see* ECF No. 46 at 1 n.1).  Therefore, he is not entitled to federal review of Ground One under this exception.

> D.    Ground Four:  "Trial counsel was ineffective for failing to present a misidentification defense, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."

Petitioner states Ground Four is different than Ground Two (ECF No. 1 at 22). He states in Ground Four, he is asserting that defense counsel should have questioned Deputy Reeves about the physical description of the "third" robber provided by Farren Longenecker and Jimmie Freeman, specifically, their description of a large tattoo on the side of the neck (*id.*).  Petitioner argues defense counsel alternatively should have admitted Deputy Reeves' police report into evidence (*id.*). Petitioner concedes the police report may not have been admissible under state evidentiary rules, but argues it was admissible "as a matter of due process" (*id.* at 22–23).

Petitioner contends counsel also could have called Deputy Geraldi and Aimee Moore as trial witnesses (ECF No. 1 at 23). Petitioner asserts Deputy Geraldi was the author of the BOLO, which included the description of the robber's neck tattoo, and Geraldi could have testified to the contents of the BOLO, which then could have been admitted into evidence (*id.*). Petitioner alleges Aimee Moore was the private investigator with Third Eye Investigations who interviewed the four witnesses who described the "third" robber as having a large neck tattoo (*id.*).

Petitioner contends there is a reasonable probability the outcome of trial would have been different if defense counsel had presented this testimony and evidence at trial (ECF No. 1 at 23). As with Ground One, Petitioner concedes he did not exhaust this IATC claim in the state courts, but he contends he is entitled to federal review under *Martinez* (ECF No. 1 at 24–25; ECF No. 46 at 25–29). Petitioner alternatively asserts his actual innocence (ECF No. 1 at 24).

Respondent contends Petitioner's claim is procedurally barred from federal review, because he did not present it to the state courts (ECF No. 40 at 17). Respondent contends Petitioner is not entitled to federal review under *Martinez* because his underlying IATC claim is not "substantial" (*id.* at 17–18).

Testimony concerning a victim's or a witness' out-of-court description of an assailant is classic hearsay and generally not admissible into evidence unless it falls

under a hearsay exception. *See Puryear v. State*, 810 So. 2d 901, 906 (Fla. 2002) (holding that testimony by two witnesses regarding the victim's out-of-court description of the assailant was not admissible as statements of identification under Florida Statutes § 90.801(2)(c), because a description is not an identification); *Swafford v. State*, 533 So. 2d 270, 276 (Fla. 1988) (holding that trial court properly excluded as hearsay police bulletin that contained victim's description of assailant); *Livingston v. State*, 219 So. 3d 911, 914–15 (Fla. 2d DCA 2017) (holding that deputy's testimony regarding description of suspect as given to him by the victim and deputy's testimony regarding description of suspect as related in a BOLO generally constituted hearsay); *English v. State*, 43 So.3d 871, 872–73 (Fla. 5th DCA 2010) (holding that the trial court erred by admitting deputy's description of the suspect that was sent out in BOLO); *Presley v. State*, 839 So. 2d 813, 813 (Fla. 4th DCA 2003) (holding that BOLO containing out-of-court description of perpetrator constituted inadmissible hearsay); *Hendrieth v. State*, 483 So.2d 768, 769 (Fla. 1st DCA 1986) (holding that trial court erred in allowing police officer to testify regarding the victim's description of the perpetrators, because such testimony did not fall within any hearsay exception).

Jurists of reason could not debate that Petitioner has not made a valid showing of either deficient performance or prejudice with respect to Attorney Collins' failure

to present testimony from Deputy Reeves, Deputy Geraldi, and/or Investigator Moore about the witnesses' physical description of the "third" robber. Therefore, Petitioner has failed to show that the IATC claim presented in Ground Four is a "substantial one" under *Martinez*. Accordingly, Petitioner is not entitled to federal review of this IATC claim. And for the reasons discussed *supra* in Ground One, Petitioner has not satisfied the "actual innocence" exception to the procedural bar. Therefore, Petitioner is not entitled to federal review of Ground Four.

E.    Ground Five: "Trial counsel was ineffective for failing to challenge the State's fingerprint evidence, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."

Petitioner contends Attorney Collins was deficient for failing to question the fingerprint analyst about whether she could say when the fingerprint was placed on the glove wrapper (ECF No. 1 at 25–27). Petitioner also contends Collins should have questioned Lieutenant Butler about whether the store's surveillance video showed the robber touching the wrapper with his right little finger (*id.*). Petitioner contends counsel also should have argued that the wrapper was found in a public area meant to be frequented by people (*id.*). Petitioner contends if Attorney Collins had elicited this testimony and argued that the fingerprint evidence had little probative value, there is a reasonable probability the outcome of trial would have been different (*id.*). Petitioner concedes he did not exhaust this IATC claim in the

state courts, but he contends he is entitled to federal review under *Martinez* (ECF No. 1 at 27–29; ECF No. 46 at 29–36).  Petitioner alternatively asserts his actual innocence (ECF No. 1 at 29).

Respondent contends Petitioner's claim is procedurally barred from federal review, because he did not present it to the state courts (ECF No. 40 at 19). Respondent contends Petitioner is not entitled to federal review under *Martinez* because his underlying IATC claim is not "substantial" (*id.* at 19–20).

The trial transcript demonstrates that Attorney Collins attempted to cast doubt on the fingerprint evidence through his cross-examination of the State's witnesses. Collins elicited testimony from Lieutenant Butler that there was a delay of at least an hour between the time she viewed the video showing the suspect touching the glove wrapper and the time Detective Punausuia actually lifted the fingerprint from the wrapper, thus suggesting an opportunity for contamination (Ex. C4 at 138–39). Attorney Collins emphasized during his cross-examination of both Detective Punausuia and Ms. Bowen, the fingerprint examiner, that the fingerprint was only a partial or "incomplete portion" of a fingerprint (*id.* at 151, 174–75).  And Collins elicited testimony that Detective Punausuia consulted with Examiner Bowen about whether the partial fingerprint was of sufficient quality to compare with fingerprints in the Automatic Fingerprint Identification System ("AFIS") (*id.* at 151–52).

Attorney Collins additionally elicited testimony from Examiner Bowen that when she ran the partial fingerprint through AFIS, it returned twenty (20) possible candidates who could be a possible match to the fingerprint, and that AFIS did not actually identify the fingerprint as Petitioner's (*id.* at 178–79).  Collins elicited testimony from Examiner Bowen that the only reason she compared the partial fingerprint to Petitioner's was because law enforcement officers provided her with a sample of Petitioner's prints (*id.* at 179).

Attorney Collins argued during his closing that the probative value of the fingerprint was minimal, because (1) it was only a partial fingerprint, (2) there were twenty possible matches for the partial fingerprint, and (3) the video showed the third suspect touching more than just the glove wrapper, but investigators did not analyze any of the other items, including the gloves remaining in the wrapper (ECF No. C4 at 303–04, 309–10).

Jurists of reason would not find it debatable whether Petitioner has stated a valid claim of *Strickland* prejudice—he has not.  Petitioner faults Attorney Collins for not eliciting testimony from Examiner Bowen that she could not state when the partial fingerprint was placed on the glove wrapper.  But this testimony would have had little probative value, considering the other persuasive arguments made by Collins on the subject during closing, as well as Lieutenant Butler's testimony that

the video showed one of the robbers pick up that item during the robbery, and Detective Punausuia's testimony that he recovered only one partial fingerprint from that item, which was the fingerprint submitted for examination.

Petitioner also faults Attorney Collins for not questioning Lieutenant Butler about whether the store's surveillance video showed which hand the robber used to pick up the package of gloves. But the video was submitted as evidence and played to the jury (*see* Ex. C4 at 118–19, 160–63), so they could make a determination of whether it showed which hand the robber used.

Finally, Petitioner faults Attorney Collins for not arguing that the fingerprint was found in a place frequented by the public. But that fact was obvious. Attorney Collins was by no means deficient for failing to point it out.

Petitioner has not stated a substantial IATC claim with respect to Attorney Collins' handling of the fingerprint issue. Therefore, Petitioner has not shown he is entitled to a federal merits review of Ground Five under *Martinez*.

F.    <u>Ground Seven:  "Trial counsel was ineffective for failing to challenge the officer's testimony comparing Burke's ring to the ring worn by the third robber, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."</u>

<u>Ground Eight:  "Trial counsel was ineffective for failing to challenge the officer's interpretation of Burke's statement about his ring, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."</u>

In Ground Seven, Petitioner alleges Attorney Collins was ineffective for failing to cross-examine Deputy Chaires' "comparison testimony" regarding Petitioner's ring (ECF No. 1 at 34–36). Petitioner contends Collins should have elicited Chaires' admissions that (1) the photographs from the surveillance video were "extraordinarily grainy"; (2) he had no special expertise in "surveillance photo identification" or "ring identification"; (3) the photographs were black and white, so he could not determine if the ring in the photograph was the same color as Petitioner's ring; (4) wedding bands are "by nature, nondescript"; and (5) the image shown in the photograph may not be a ring (*id.*). Petitioner alleges if Attorney Collins had elicited these admissions, the only value of Deputy Chaires' testimony would been to establish that the third robber had a shiny object on his hand, and that Petitioner was wearing a ring at the time Chaires interviewed him (*id.*). Petitioner alleges there is a reasonable probability the outcome of trial would have been different if Attorney Collins had elicited these admissions from Deputy Chaires (*id.*).

In Ground Eight, Petitioner contends Attorney Collins was ineffective for failing to cross-examine Deputy Chaires about his interpretation of Petitioner's comment, "What, my ring?" and then argue during closing arguments that Chaires' interpretation was not the only reasonable interpretation (ECF No. 1 at 38–40).

Petitioner contends Attorney Collins should have argued (1) that Petitioner was simply seeking clarification of whether Chaires was claiming he could link Petitioner to the robbery based upon his ring, and (2) that Petitioner was expressing disbelief that Chaires was implying Petitioner was guilty based solely on the fact he was wearing a ring at the time of the interview (*id.*). Petitioner contends if Attorney Collins had cross-examined Chaires as Petitioner suggests, and argued that Chaires' interpretation was unreasonable, there is a reasonable probability the outcome of trial would have been different (*id.*).

Petitioner concedes he did not present Ground Seven or Ground Eight in his Rule 3.850 motion (ECF No. 1 at 36–37, 40–41; ECF No. 46 at 36–39). He contends he is entitled to federal review of his claim under *Martinez* (ECF No. at 37–38, 40–41; ECF No. 46 at 36–39).

Respondent contends Petitioner is not entitled to federal review under *Martinez*, because his underlying IATC claim is not a "substantial" one (ECF No. 40 at 22–26).

The trial transcript shows that Deputy Chaires testified he told Petitioner there were ways to identify someone even though the person was wearing a mask, for example, from a particular piece of clothing, a personal mark, or jewelry (Ex. C4 at 199). Deputy Chaires testified Petitioner responded by asking Chaires if he was

referring to "his [Petitioner's] ring" (*id.*).    Chaires testified Petitioner's ring "matched" the ring in the photograph (*id.* at 200).

On cross-examination, Attorney Collins elicited testimony that suggested Deputy Chaires, not Petitioner, was the first to suggest that Petitioner's ring was depicted in the photograph.  Collins showed Deputy Chaires an excerpt from his pre-trial deposition, and Chaires admitted that Petitioner did not reference his ring until after Chaires showed him photographs and focused Petitioner's attention on a person wearing a ring, and then Petitioner responded by asking Chaires if he was referring to his ring (Ex. C4 at 204–05).

On re-direct, the prosecutor elicited testimony that suggested Petitioner was the first to suggest that the photograph showed his ring:

> Q.  So that I understand what Mr. Collins talked about, you're talking about the robber and you're showing him still photos of the people—the person with the green mask who committed it, right?
>
> A.  That's correct.
>
> Q.  And one of his hands—two of the guys had gloves the whole time, right?
>
> A.  That's correct.
>
> Q.  And you pointed out the fact that on that bare hand there was a piece of jewelry on it?
>
> A.  That's correct.

Q.  And when he pointed it out, he didn't say, oh, that guy's got a ring on, he said, what do you mean, my ring?

A.  That's correct. . . .

Q.  So he was using the possessive, indicating . . . the ring in the picture was not some ring, that guy's ring or anything, that's my ring in the picture on the hand of the guy with the mask?

A.  Correct.

(Ex. C4 at 205–06).

During closing arguments, the prosecutor argued that the import of Deputy Chaires' testimony was not that <u>Chaires</u> believed that the shiny object in the photograph was Petitioner's ring, but that <u>Petitioner</u> believed it, as evidenced by his comment, "My ring?" after Chaires showed Petitioner the still photographs, pointed out a robber's ungloved hand, and commented that there were ways to identify someone even though the person was wearing a mask, for example, from a particular piece of jewelry (*see* Ex. C4 at 292, 317–18).

Attorney Collins argued that Deputy Chaires' testimony, that Petitioner identified himself as the person in the photograph, was inconsistent with his deposition testimony and thus should not be believed (Ex. C4 at 304–05).  Collins also argued that the State failed to produce the ring at trial, and that neither the video nor the photographs showed a ring:

Todd Chaires. . . . I strongly differ with what Mr. Campbell [the prosecutor] said when it comes to his testimony and I hope that you do, too. And I hope that you took good notes and rely upon them.

Todd Chaires first on direct examination stated what? He stated that before Mr. Burke was shown any pictures at all—remember the stills that he came with from the surveillance video—that my client volunteers his ring, with no mention of anything.

Then, on cross-examination, he changed his story because he was referred to his deposition earlier. . . . [W]hat did he say? No. He changed his testimony. He stated that's not what happened. He stated he showed him these 11 pictures that you also have that had a focus of a ring on someone's hand and then that's when my client made reference to the ring on his finger. Completely different than just volunteering your ring. That's what he said on cross, ladies and gentlemen.

But then what did he say on redirect when the State questioned him? Not only did he go back to saying he voluntarily gave up his ring, but now Mr. Burke identifies himself as the person in the picture during the course of this incident.

You have three different rendition of events that happened that he testified to. And that was a witness who was called in the State's case-in-chief. I don't know which one you're supposed to believe. I would go by the one that was brought out on cross, that he didn't give up or make reference to the ring until after he was shown the pictures, like he said in his deposition when he was sworn to tell the truth. But you've got three to choose from. Take your pick.

We'll get back to it in a minute, but where is the ring? Where is the ring? Where do you see the ring in the video? Where do you see the ring in any pictures?

(Ex. C4 at 304–06).

Jurists of reason could not disagree that Attorney Collins competently cross-examined Deputy Chaires and argued to the jury that Petitioner's comment, "What, my ring?" was not an admission that his ring was depicted in the photograph. Additionally, jurists of reason could not disagree that there is no reasonable probability the jury would have returned a different verdict if Attorney Collins had cross-examined Deputy Chaires differently or altered his closing argument regarding the probative value of Chaires' testimony in determining whether the State established Petitioner's guilt beyond a reasonable doubt.

Petitioner has not stated a substantial IATC claim in Ground Seven or Ground Eight. Therefore, he is not entitled to federal review of either claim under *Martinez*.

G.    Ground Ten:  "Trial counsel was ineffective for failing to challenge the mask, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."

Petitioner alleges the prosecutor argued that a camouflage ski mask recovered from Petitioner's home was consistent with the victims' description of the ski mask worn by the "third" robber (ECF No. 1 at 48–50). Petitioner contends Attorney Collins was ineffective for failing to elicit the following testimony from the robbery victims:  (1) they could only state the "design category" of the mask, (2) the "camouflage design" is not rare or unique; (3) ski masks are not illegal or

uncommon; and (4) they could not state whether the mask found in Petitioner's home was the mask worn by the robber (*id.*).

Petitioner contends Attorney Collins was ineffective for failing to elicit the following testimony from Deputy Reeves: (1) the "camouflage design" is not rare or unique; (2) ski masks are not illegal or uncommon; (3) he could not state whether the mask found in Petitioner's home was the mask worn by the robber; (4) he did not find any evidence that Petitioner possessed the mask found in his home; and (5) the surveillance video did not show that the mask found in Petitioner's home was the mask worn by the robber (ECF No. 1 at 48–50).

Petitioner concedes he did not present Ground Ten in his Rule 3.850 motion (ECF No. 1 at 51; ECF No. 46 at 39–42). He contends he is entitled to federal review of his claim under *Martinez* (ECF No. 1 at 51–52; ECF No. 46 at 39– 42).

Respondent contends Petitioner is not entitled to federal review under *Martinez*, because his underlying IATC claim is not a "substantial" one (ECF No. 40 at 28–29).

During Attorney Collins' closing argument, he argued that ten of the eleven witnesses to the robbery did not mention that the "third" robber was wearing a camouflage mask (Ex. C4 at 293–99, 306–07). Collins argued that the first mention of a camouflage mask was during Jeffrey Groom's testimony, but Groom testified

he was unsure of the color of the mask—it may have been camouflage or it may have been black (*id.* at 299). Attorney Collins argued that the "camouflage mask theme" developed only because Deputy Reeves found a camouflage mask in Petitioner's home (*id.*). Collins then argued that the fact that Petitioner's DNA as well as the DNA of two other contributors, was found in a camouflage mask in Petitioner's home days after the robbery did not prove anything (*id.* at 304, 310).

Since none of the witnesses definitively testified that one of the robbers was wearing a camouflage mask, and Deputy Reeves' only testimony about it was that he found a camouflage mask in Petitioner's home, it was not only reasonable but wise of Attorney Collins not to mention "camouflage" during cross-examination, and then argue during closing that there was insufficient evidence connecting the ski mask located in Petitioner's home to the robbery. Jurists of reason could not disagree that Collins competently handled the mask issue. And jurists of reason could not disagree that there is no reasonable probability the verdict would have been different if Collins had asked the questions that Petitioner faults him for not asking.

Petitioner has not stated a substantial IATC claim in Ground Ten. Therefore, he is not entitled to federal review of the claim under *Martinez*.

H.    <u>Ground Three: "Trial counsel was ineffective for failing to depose and perpetuate the testimony of three witnesses, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."</u>

> Ground Six:  "Trial counsel was ineffective for failing to move to exclude the officer's testimony comparing Burke's ring to the ring worn by the third robber, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."

> Ground Nine:  "Trial counsel was ineffective for failing to move to exclude the mask, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."

> Ground Twelve:  "Trial counsel was ineffective for failing to file a motion to suppress, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."

> Ground Thirteen:  "Trial counsel was ineffective for failing to call alibi witnesses to testify at Burke's trial, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."

Petitioner states he presented all five of these IATC claims in Grounds One, Two, and Three of his Rule 3.850 motion (*see* ECF No. 1 at 20–21, 32–33, 46–47, 60–61, 65–66).  He concedes he did not present any of them in the post-conviction appeal to the First DCA (ECF No. 1 at 21, 32–33, 47, 60–61, 66; ECF No. 46 at 20, 48).  Petitioner relies upon *Martinez* to excuse the procedural default (ECF No. 1 at 21–22, 33, 47, 61, 66; ECF No. 46 at 48).

Respondent contends Grounds Three, Six, Nine, Twelve, and Thirteen are unexhausted and procedurally barred, because Petitioner failed to appeal the circuit court's denial of these IATC claim to the First DCA (*see* ECF No. 40 at 15, 20–21, 26, 33, 35).  Respondent contends Petitioner may not rely upon *Martinez* to excuse

the procedural default of his post-conviction <u>appellate</u> counsel (*id.* at 15–16, 20–22, 26–27, 33–36).

The Florida Rules of Appellate Procedure provide that in a case where a movant's Rule 3.850 motion is denied after an evidentiary hearing, a movant wishing to appeal the denial of his motion must file an initial brief. *See* Fla. R. App. P. 9.141(b)(3); *see also Pennington v. State*, 34 So. 3d 151, 153 at n.1 (Fla. 1st DCA 2010) (briefing is required in appeal from non-summary denial of Rule 3.850 motion). It is also well established in the Florida courts that claims for which an appellant has not presented any argument, or for which he provides only conclusory argument, are insufficiently presented for review and are waived. *See Marshall v. State*, 854 So. 2d 1235, 1252 (Fla. 2003) (holding that claims are not sufficiently presented for appellate review where appellant simply lists the issue raised below and presents no definitive argument in initial brief on appeal); *Sweet v. State*, 810 So. 2d 854, 870 (Fla. 2002) (holding that instances of ineffectiveness of counsel are not preserved for appellate review where appellant simply recites them from his post-conviction motion "in a sentence or two, without elaboration or explanation"); *Shere v. State*, 742 So.2d 215, 218 n. 6 (Fla.1999) (holding that issues raised in appellate brief that contain no argument are deemed abandoned).

Here, the state court record demonstrates that Petitioner presented all five of these IATC claims in his Rule 3.850 motion, as Ground 1 (Grounds Nine and Twelve of the § 2254 petition), Ground 2 (Ground Six of the § 2254 petition), Ground 3 (Ground Three of the § 2254 petition), and Ground 5 (Ground Thirteen of the § 2254 petition) (Ex. C2 at 199–205, 207–09). As previously noted, the state circuit court held an evidentiary hearing on all of Petitioner's post-conviction claims (Ex. C2 at 257, Ex. C3). The state circuit court denied Petitioner's Rule 3.850 motion, and expressly discussed Grounds 1–5 (Ex. C2 at 272–76). In Petitioner's initial brief on appeal of the circuit court's decision, Petitioner provided substantive argument on only one claim, Ground 4 of the Rule 3.850 motion, and he asserted a procedural argument with respect to the circuit court's failure to specifically address Grounds 6, 8, 11, and 14 in its written order (*see* Ex. C6). Petitioner did not mention Grounds 1, 2, 3, or 5 (*see id.*). By failing to present any argument on Grounds 1, 2, 3, or 5, Petitioner waived or abandoned appellate review of the claims presented in Grounds Three, Six, Nine, Twelve, and Thirteen of his § 2254 petition. Therefore, the claims are procedurally barred from federal review.

Petitioner argues he may obtain federal review of his admittedly procedurally defaulted claims under *Martinez*. But the *Martinez* rule is expressly limited to attorney errors in initial-review collateral proceedings: "[T]he holding in [*Martinez*]

does not concern attorney errors in other kinds of proceedings, <u>including appeals from initial-review collateral proceedings</u>, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Martinez*, 566 U.S. at 15 (emphasis added).

Here, the procedural default occurred in the appeal from the initial-review collateral proceeding. Therefore, Petitioner cannot benefit from the equitable rule announced in *Martinez*.

> I.  <u>Ground Fourteen: "Trial counsel's cumulative deficiencies amounted to ineffective assistance of counsel, depriving Burke of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution."</u>

Petitioner contends he has detailed thirteen ways in which Attorney Collins performed deficiently (ECF No. 1 at 67–69). He contends the cumulative effect of these errors deprived him of effective assistance of counsel and a fair trial (*id.*). Petitioner states he presented this "cumulative effect" claim in his Rule 3.850 motion, but he concedes he did not present it in the post-conviction appeal (*id.* at 70). Petitioner once again depends on *Martinez* to excuse the procedural default (*id.*).

Respondent agrees with Petitioner that the "cumulative effect" claim is partially procedurally defaulted (*see* ECF No. 40 at 37–38, 104). Respondent contends notwithstanding the procedural default, Petitioner is not entitled to relief

(*id.* at 104–05).  Respondent contends Petitioner failed to establish any error by trial counsel; therefore, there can be no cumulative effect compelling federal habeas relief (*id.*).

Cumulative effect analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors.  *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (holding that cumulative error claim fails in light of the absence of any individual errors to accumulate); *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) (holding that "[w]here there is no error or only a single error, there can be no cumulative error").

Here, Petitioner has not shown error of a constitutional dimension with respect to any of the alleged errors of trial counsel which this court has reviewed.  Therefore, Petitioner is not entitled to federal habeas relief on his "cumulative effect" claim.

V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327). The petitioner here cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>15</u><sup>th</sup> day of August 2019.


<u>/s/ *Elizabeth M. Timothy*</u>
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**